1                  United States District Court

2              for the Southern District of California

3

4   OBESITY RESEARCH INSTITUTE, LLC,   )
                                       )   No. 15-CV-595-BAS
5        Plaintiff,                    )
                                       )   October 27, 2015
6            v.                        )
                                       )
7   FIBER RESEARCH INTERNATIONAL,      )   San Diego, California
    LLC,                               )
8                                      )
         Defendant.                    )
9

10
                      Transcript of Motion Hearing
11              BEFORE THE HONORABLE MITCHELL D. DEMBIN
                    United States Magistrate Judge
12
    APPEARANCES:
13
    For the Plaintiff:        GORDON & REES, LLP
14                            SEAN FLAHERTY
                              AMANDA ABELN
15                            101 West Broadway, Suite 2000
                              San Diego, CA   92101
16
    For the Defendant:        THE LAW OFFICE OF JACK FITZGERALD, PC
17                            JACK FITZGERALD
                              MELANIE PERSINGER
18                            3636 Fourth Avenue, Suite 202
                              San Diego, CA   92103
19

20
    Transcriber:              Dana Peabody, RDR, CRR
21                            District Court Clerk's Office
                              333 West Broadway, Suite 420
22                            San Diego, California, 92101

23

24
    Proceedings Recorded; Transcript Produced with Computer-Aided
25  Transcription Software by a Court Reporter

1               San Diego, California, October 27, 2015

2                              *   *   *

3          THE CLERK:  Calling matter 1 on the calendar, case

4   number 15-CV-595-BAS-MTB, Obesity Research Institute, LLC,

5   versus Fiber Research International, LLC, et al.

6          THE COURT:  Can I have the appearances, plaintiffs

7   first.

8          MR. FLAHERTY:  Good morning, Your Honor.  Sean

9   Flaherty on behalf of the plaintiff Obesity Research Institute.

10         THE COURT:  Thank you.

11         MS. ABELN:  Amanda Abeln on behalf of Obesity.

12         THE COURT:  Thank you.

13         MR. FITZGERALD:  Good morning, Your Honor.  Jack

14   Fitzgerald on behalf of Fiber Research.

15         THE COURT:  Thank you.

16         MS. PERSINGER:  Good morning, Your Honor.  Melanie

17   Persinger on behalf of Fiber Research.

18         THE COURT:  Thanks.  So I brought you in -- I decided

19   not to do this one on the papers originally because I was

20   confused, and then once my confusion abated, I thought I'd

21   bring you in anyway and say hello.

22         And the reason I realized I got confused was because

23   the dispute is backwards it seems to me, and that really for

24   whatever reason I struggled with that because, of course, it is

25   Obesity -- it's Obesity that has the -- you know, the punitive

1  defense of laches, all right, but it is the defendant that is
2  seeking discovery regarding that issue.

3       So -- and I found that -- I just -- I just found -- I
4  had to kind of wrap my head around it because basically the
5  discovery that's being sought by Fiber potentially supports the
6  claim of laches, and Obesity is fighting against that discovery
7  that presumably is to Obesity's benefit even though they're not
8  the one taking discovery, which means they're not paying for it
9  other than lawyer time.

10      So that just kind of for whatever reason -- that
11  struck me as odd, and I really had a hard time getting around
12  it, but I finally did get around it because it is true that in
13  the first amended counterclaims, Fiber does make assertions
14  regarding when Obesity did things beginning back in '06/'07.
15  Of course, it doesn't mean that Fiber or Shimizu knew that back
16  in '06/'07, which I think is the argument Obesity is making in
17  the motion to dismiss, but that's not for me, and that's
18  neither here nor there, but the point ultimately I realized is
19  that these allegations were made, these claims were made in the
20  amended counterclaims by Fiber, and they have a right to
21  discovery to support their claims.  Certainly Obesity has
22  raised the issue of laches in the context of the motion to
23  dismiss, but, honestly, it didn't even have to.  Under Ninth
24  Circuit there's a presumption of laches when based on the claim
25  itself.  It looks like something goes back in time, so the

1   amended counterclaims themselves by making allegations about

2   things started to happen, the '06/'07 and beyond time frame,

3   the presumption of laches is there already, and the consequence

4   of that, it seems to be a legitimately discoverable topic.

5        As I say, that confused me because I expected Obesity

6   to be pursuing that line of discovery, and maybe they just beat

7   them to it, but, again, it just seemed bizarre to me.

8        So with that backdrop, it does seem that there is

9   discovery that -- that is legitimate and relevant for both

10  sides regarding the issue of laches.  I think, as I say, it's

11  odd that it is the defendant seeking the discovery that

12  makes -- vindicate plaintiff's position, but that's on the one

13  hand.  On the other hand, it could serve to vindicate Fiber's

14  position that there have been false statements about Obesity's

15  product.

16       So with that, to the extent that information has been

17  withheld, and I'm going to go through them individually, each

18  of the ones, but as a general matter, and I'll get into

19  individual relevance concerns as we go forward, but as a

20  general matter, to the extent that it is relevant, the notion

21  that discovery cannot be had back to '06, I'm going to overrule

22  those objections.  So as a general principle.

23       Does anybody want to be heard on that before we go

24  forward into the individual interrogatories and RFPs at issue?

25  I'm happy to hear whatever argument you may have.  You can go

1    ahead and snatch defeat from the jaws of victory if you like.

2            MR. FLAHERTY:  Yes, Your Honor, if I may be heard.

3            THE COURT:  Sure.  Of course.  That's why we're here.

4            MR. FLAHERTY:  The issue with the laches defense is

5    not so much one about what Obesity knew, it's one about what

6    Shimizu knew.

7            THE COURT:  Correct.

8            MR. FLAHERTY:  And as a result, we don't think the

9    statute as to Obesity should be going back ten years.  If they

10   want to discover --

11           THE COURT:  The point of it to me that kind of turned

12   me around, if you will, was the notion that in their first

13   amended counterclaims they make allegations about things that

14   Obesity did that are -- that are claims, amended counterclaims,

15   and they have the right to discover evidence regarding their

16   claims, their allegations.

17           MR. FLAHERTY:  When the allegations for those actions

18   fall specifically outside what would be the imported statute of

19   limitations under the claims that this makes.

20           THE COURT:  So you're arguing it would be relevant if

21   you were asking the nonrelevant --

22           MR. FLAHERTY:  Absolutely.

23           THE COURT:  No, it doesn't work that way.  Relevance

24   is a two-way street.

25           MR. FLAHERTY:  Understood.  I mean that's the

1   argument.

2           THE COURT:  Happy to discuss it.  That's why I'm here.

3           MR. FLAHERTY:  Understood.  That is the argument,

4   Your Honor.

5           THE COURT:  All right.

6           MR. FLAHERTY:  I think that we would be able to

7   propound that discovery to defend ourselves.

8           THE COURT:  To affirmatively -- that's why I got

9   confused.  Because you certainly could have, and they could

10  have affirmatively seek discovery to support the defense of

11  laches.  The fact that the defendant sort of preempted that

12  doesn't make it any less relevant because laches is in the

13  case.

14          MR. FLAHERTY:  Understood.

15          THE COURT:  I mean unless you were going to stand up

16  and say we affirmatively disavow any defense based on laches,

17  honestly I'd have to reconsider.

18          MR. FLAHERTY:  No, we're not --

19          THE COURT:  Okay.  And that's fine.  Because that

20  would change the game.

21          MR. FLAHERTY:  I understand.

22          THE COURT:  That would change it to whatever the

23  applicable statute of limitations period is.

24          MR. FLAHERTY:  Understood.

25          THE COURT:  But as long as laches remains viable,

1   anyone can discover it because you can discover about claims

2   and defenses.

3            MR. FLAHERTY:  Okay.

4            THE COURT:  It's not a -- it is a two-way street.

5            MR. FLAHERTY:  Understood.

6            THE COURT:  All right.

7            MR. FITZGERALD:  At the risk of --

8            THE COURT:  Go ahead, I dare you.

9            MR. FITZGERALD:  I appreciate --

10           THE COURT:  Stand up.

11           MR. FITZGERALD:  Yes, I appreciate you looking out for

12  me.  I'll just make two quick points.  One is that --

13           THE COURT:  I'm looking out for you?

14           MR. FITZGERALD:  By suggesting that I not snatch

15  victory from the jaws of defeat, from the jaws of victory, as

16  you said, but just to make two points.  By way of explanation

17  with respect to some of the confusion you mentioned, number one

18  is Obesity Research has produced selective documents from 2004

19  through 2006, the documents that they think support their case

20  for laches while obscuring other information from that time

21  period.  So that's one of the reasons.  And I've got some of

22  those documents here.  I'm happy to get them up, but that's one

23  point to make.

24           And the second point is that there is a defense to the

25  defense of laches, which is that the party asserting the

1  defense of laches comes with unclean hands, and so that would
2  be relevant.  That's all I have to say, Your Honor.

3  THE COURT:  Yeah, it's not enough for me to say that
4  you have, in fact, snatched defeat from the jaws of this -- of
5  this limited victory.

6  So as a consequence, let me -- let's go through the
7  individual interrogatories and RFPs that are at issue, and I'll
8  go ahead and rule on them, and we'll move forward from there.

9  Before I do that, let me also say that it is
10  concerning to me that we've had this flurry of discovery
11  disputes all brought on October 5.  I know that these discovery
12  disputes predated the arrival of new counsel, and they were,
13  you know, I think granted a motion to bring them late, but
14  it -- it is actually the rare case that we -- that we have this
15  flurry of activity.  It suggests that there has been a bit of a
16  breakdown in communication in terms of the meet and confer
17  process.  I do need you to redouble your efforts in that
18  regard.

19  I will say that it's only a very short period of time
20  from now before the new federal rules go into effect.  I am
21  quite conversant with them, and I intend to enforce them.  And
22  I'll say this:  Specifically with regard to Rule 34, which
23  changes the game, I think, dramatically in terms of discovery
24  practice regarding requests for production of documents, you
25  know, December 1, and I'm actually of a mind to enforce it

1  sooner.  While one can certainly interpose objections, one must

2  otherwise disclose what they have, and one must identify what

3  they are withholding based upon which objection.  I think it

4  kills -- I'm hoping -- actually I'm cautiously hopeful,

5  although it probably won't happen, that it kills the

6  boilerplate objection with regard to request for production,

7  and will really sharpen discovery practice in that regard.

8          So going forward, I'm hoping that the type of dispute

9  we're seeing on the RFPs, here at least, will fall by the

10  wayside, and if not, the dispute will be much more sharpened

11  because you'll have to say what you're withholding based on

12  what objection, which, as I say, hopefully will change things.

13  So I just want to put you on notice that I'm going to be doing

14  that.

15          MR. FITZGERALD:  Thank you, Your Honor.

16          THE COURT:  Don't thank me now.  You might be on the

17  other end of that stick.

18          All right.  So with regard to the matters in dispute,

19  interrogatory number 1 was manufacturers of the product.  Now

20  that I've ruled that this is open into '06 -- you've asked for

21  ten years, it's really nine, but this '06 was the first

22  allegation that I saw in the first amended counterclaims.

23  That's the year, so I'm going to hold you to '06, and I think

24  that this is relevant on the issue of both of the Lanham Act as

25  well as -- as well as the issue of laches.

1     MR. FITZGERALD:  May I briefly address the time

2  period, Your Honor?

3          THE COURT:  I'm really --

4          MR. FITZGERALD:  Well, the only reason is that the

5  letters -- they had a product called Propylene before they sort

6  of renamed it to Lipozene, which was 2006, but the facts

7  surrounding Propylene and the Katz study Propylene, there are

8  letters from 2004, 2005 that they're relying on for their

9  laches defense, so I'm not sure the manufacturer would be

10  different between '05 and '06, but that is one.

11          THE COURT:  I'm going to stick with the '06, and as we

12  go forward, I'm also just to be clear, I'm sticking with

13  Lipozene.

14          MR. FLAHERTY:  Your Honor, would Your Honor consider

15  the last three years given the -- our allegations or our

16  arguments as to the appropriate statute of limitations as well

17  as, say, a year on either side of '06?  It just becomes very,

18  very burdensome to go back through ten years of documents.

19          THE COURT:  Well, yes and no.  The issue for you is I

20  think you're arguing against your own interests.  If that's

21  what you want to do, that's fine, but your defense of laches

22  is -- suggests at least what was said in the motion to dismiss,

23  you need to show that the defendant was on notice that you were

24  using a particular formulation of this product back well before

25  the statute of limitations period, and they know it, and you're

1   prejudiced by going forward.

2          If I cut off the discovery, I'll cut it off both ways,

3   but you're never going to get that.  So, again, I see this as a

4   two-way street.  This evidence -- I mean you remember, this

5   isn't a game.  I mean the evidence is the evidence.  Whatever

6   it is it is.  The claims and defenses are what they are.

7   Though they can be modified going forward, right now there's a

8   claim on the table.  There's a presumption of laches based upon

9   the way I read the Ninth Circuit law because of the first

10  amended counterclaims.  It's your burden to prove it, and

11  you're suggesting to me that I not allow the evidence that

12  supports your defense to be exposed.

13         MR. FLAHERTY:  I understand it may seem odd.  My

14  effort is not to preclude our own defense or to prevent

15  discovery on relevant information.  My effort is to try and

16  creatively and collaboratively in a way that would make the

17  discovery not so burdensome such that --

18         THE COURT:  Well, I don't know how burdensome it is

19  because I haven't received a showing.  I mean if -- I don't

20  know what document you would -- you may already know the extent

21  of the discovery I am opening up.  I don't know that something

22  like identifying your manufacturers can be burdensome.

23         MR. FLAHERTY:  Understood.

24         THE COURT:  As we go forward, perhaps there are things

25  that you're going to make that suggestion, but it's not enough

1  to say so.  It requires proof that is this tranche of data,
2  it's in legacy format, it's going to cost us more than this
3  case is worth to find it.  You know, give me a declaration.
4  Let it be challenged, and I can deal with it.  But just the
5  fact that this is covering the period of time doesn't
6  necessarily make it unduly burdensome, particularly when it
7  seems to me that this is going to potentially support your
8  defense.  So it's a weird argument that you're making.  Do you
9  see my point?
10         MR. FLAHERTY:  I see your point 100 percent.  I
11  just -- I believe that time and scope are kind of on a
12  continuum, and if we're going to go back in time forever, then
13  the scope should be very --
14         THE COURT:  And, as I say, I'm going to limit the
15  scope when we get to them to Lipozene anyway.
16         MR. FLAHERTY:  Okay.
17         THE COURT:  It does help.  I think this case is about
18  Lipozene.
19         MR. FLAHERTY:  Correct.
20         THE COURT:  But -- all right.  So let's -- I have a
21  ruling on interrogatory number 1.
22         2 is basically a spinoff of the same thing.  This will
23  be any source of the ingredients contained in the Lipozene
24  product again going back nine years.  I think it goes to the
25  heart of the laches defense as well as ultimately within the

1    statute of limitations period to both the declaratory judgment
2    action by the plaintiffs as well as the counterclaims by the
3    defendants.
4          I look at 3 the same way.  4 I'm going to grant the
5    objections or sustain the objections.  It's a contention
6    interrogatory, which are generally disfavored.  I know that
7    they are legal, but they are disfavored, and this one, it seems
8    to me, goes to the heart of what the expert testimony is going
9    to be.  The consequence of that is -- it's just not an
10   appropriate contention interrogatory when it will be the
11   subject, clearly be the subject, of expert testimony, so I'm
12   going to not enforce interrogatory number 4.
13         Interrogatory number 5, which is basically identifying
14   everyone who ever had anything to do with Lipozene, no, it's
15   overbroad.  I'm not going to rewrite it for you.
16         Similarly number 6, all corporate officers, I don't
17   see how that helps.  It's overbroad.  Kill that one off.  I'm
18   not going to rewrite it.
19         And I'd note that when I say that, that there has been
20   a response at least for the folks during the statute of
21   limitations period, that's good enough.  We're just not going
22   to go back in time because I don't really see the relevance to
23   the laches defense with regard to that information.
24         Number 9 is a little different.  First date of sale
25   Lipozene product in the U.S. and total annual retail sales.  I

1    know I'm summarizing to some extent.  I don't think exposing

2    the first date of sale of the Lipozene product in the U.S. is

3    burdensome, so I'm going to enforce that part.

4            Total annual retail sales only during the statute of

5    limitations period regarding the Lanham Act, and the Lanham Act

6    statute is three years.

7            MR. FLAHERTY:  May I speak to that point, Your Honor?

8            THE COURT:  Sure.

9            MR. FLAHERTY:  I don't believe that the first amended

10   counterclaim puts our or Obesity's retail sales in issue.

11           THE COURT:  Well, the Lanham Act is claimed in the

12   first amended counterclaim, is it not?

13           MR. FLAHERTY:  It is alleged.

14           THE COURT:  And the Lanham Act includes damages.  I

15   appreciate the California statutes are restitution and

16   injunctive relief, but Lanham Act has a damage component.

17           MR. FLAHERTY:  Correct, but the damage component on

18   the Lanham Act, as I understand it, is defendant's lost

19   profits, not in this case the counter-claimant's lost profits,

20   not the defendant's gain profits.

21           THE COURT:  And the question there is about the sales

22   because they're not asking for your profit.  They're asking for

23   sales, and the -- well, you can make your own argument if you

24   like.  I would see -- view the argument as there's certainly

25   circumstantial evidence.

1          MR. FLAHERTY:  Well, my alternate proposal would be

2     that if they stand in the shoes of Shimizu, the alleged

3     manufacturer, by some sort of purported assignment or

4     distribution right, then they are presumptively importing or

5     selling this granulated powder by the kilo, not -- they are not

6     competitors in so far as that is concerned.  They are concerned

7     about how we have purchased the raw supply.

8          THE COURT:  And that is a great argument regarding the

9     admissibility of this information down the road and whether it

10    is actually a true measure of damage.  But I don't think it's

11    an argument that I can adopt in terms of preventing discovery.

12         MR. FLAHERTY:  Okay.  The alternative was effectively

13    that in our buying practices as opposed to our selling

14    practices, how much would we have theoretically bought from you

15    as opposed to how much did we sell at Walmart or GNC.

16         THE COURT:  This is total annual retail sales.  It's

17    not who you sold to, it's just a number.  It's a financial

18    number.  This is our total annual retail sales of Lipozene.

19         MR. FLAHERTY:  Understood.  The concern is this.

20         THE COURT:  To me this is a gross number, it's not a

21    micro number.  I would tend to agree with you on a

22    microanalysis of that.  I don't think it's valid, but with

23    regard to whether it has a potentially bearing on a damage

24    calculation, considering how broad I'm supposed to interpret

25    discovery, I think it's there, although I appreciate

1  the -- your next level argument, but here this is gross

2  information.

3          MR. FLAHERTY:  I understand it's gross information.  I

4  just don't think they pled -- the claims as pled put that in

5  issue.

6          THE COURT:  And -- okay.  Fair enough.

7          MR. FITZGERALD:  Your Honor, I don't think I need to

8  make an argument, but under 1117, this is relevant to damages

9  under the Lanham Act.

10          THE COURT:  Yeah, I thought so.

11          10 is identifiable versions of the products sold by

12  SKU.  I don't know what SKU does for you.  I am going to limit

13  this to Lipozene anyway, and I'm just not sure how this plays.

14          MR. FITZGERALD:  It's mostly sort of context,

15  background facts, but we need to know did they sell it in 60

16  capsules, 120 capsules, 30 capsules?  Did they sell a two pack?

17  Did they sell one?  It's basically the different ways they sell

18  it.  It goes to damages, the way we qualify our damages.  I

19  think in addition, it can be burdensome.

20          THE COURT:  The relevance of this is a little more

21  afield, but regarding the burdensome, I agree it's just a list.

22  I don't think that should be hard to deliver.  If this turned

23  out to be a real problem, I would view it differently, but,

24  again, it's not -- this is not the kind granular information

25  like who did you sell -- who are your customers for each

 1   version of SKU.  You're never going to get that.  Just
 2   understand.  But just this is how we sold it.  I don't see the
 3   harm.
 4           MR. FITZGERALD:  Thank you, Your Honor.
 5           THE COURT:  Don't thank me.  Don't you thank me.
 6           All right.  That gets us to the RFPs.
 7           MR. FITZGERALD:  Your Honor, just for clarity sake, I
 8   had number 7 -- and 11 as well.
 9           THE COURT:  I'll need to add that.
10           MR. FITZGERALD:  For number 7 --
11           THE COURT:  Oh, I'm sorry.  Every employee for the
12   past ten years with any involvement with any group, company?
13   No.
14           MR. FITZGERALD:  Yeah, I thought that was number 5.  I
15   realize --
16           THE COURT:  7 it's -- no, I find that overbroad.
17           MR. FITZGERALD:  Okay.  I realize it's similar and
18   it's overbroad.  What we're really looking for are the people
19   that made the marketing decisions and assessed the validity of
20   the products, but okay.
21           THE COURT:  Nope.  Okay.  That gets us to the RFPs,
22   right?
23           MR. FITZGERALD:  There was a wrong number 11 as well,
24   but it was sort of a --
25           THE COURT:  I must have flipped a page that I

1   shouldn't have flipped.  Oh, there it is.  Yeah, yeah, yeah,
2   yeah.

3          MR. FITZGERALD:  Basically just to avoid surprise and
4   collusion type of thing, if they know anybody who has relevant
5   information.

6          THE COURT:  No, no, no, I mean that is -- all that is
7   is a replay of Rule 26(a).  They had an initial disclosure
8   obligation, and I'm sure they've taken that seriously, and it's
9   a far more serious sanction than not -- number 5 is information
10  required by 26(a), so no.

11          Then that gets us to the RFPs.

12          The certificates analysis of similar documents, yeah,
13  I -- as we talked about it, I agree that the period of time is
14  back to '06, but it's Lipozene only.  It's not any product, any
15  glucosamine product.  I'm saying that wrong, right?
16  Glucomannan.  I had another case on Friday with glucosamine,
17  and I thought you've got to be kidding.  It's a test.

18          RFP 2 is very similar test analysis, quality assurance
19  reports.  Again, the time period I think is '06, and it's
20  Lipozene only.

21          3, all communications related to Lipozene since '06.
22  No.  That's overbroad by anybody's definition.  I'm not going
23  to rewrite it.

24          MR. FITZGERALD:  Your Honor, we did narrow it.  That
25  was in the motion.  You think it's still overbroad with the

1    topics?

2         THE COURT:  It is overbroad, yeah.  You have other

3    RFPs that cover what I think to be far more relevant areas of

4    inquiry, but just all communications, no.  And almost -- that

5    will almost never fly in any case ever just to be clear.

6         Now, for example, communication with Shimizu related

7    to Lipozene.  Yeah.  Absolutely.  And, again, the period going

8    back to '06.

9         5 is studies, expert report, scientific evidence

10   substantiate that supports advertising claims.  Yeah, I see

11   that.

12        Again, '06, Lipozene only.

13        Anybody can jump up when I'm really offending them

14   because I didn't intend to bring you in here and just read an

15   order.  I'm open to discussion just to be clear.  Maybe I

16   haven't made that clear.

17        MR. FITZGERALD:  I'm holding my tongue.

18        MR. FLAHERTY:  Your Honor, it's a two-edged sword.

19   Lipozene, just as Propylene, is a trademark product, and so

20   when we're talking about a -- the allegations about what is

21   Lipozene, and they only mention Lipozene being marketed under

22   some false advertising, and indeed they only relate to

23   Lipozene, but the predecessor products admittedly are very

24   similar if not identical and marketed under a different

25   trademark, and thus if we -- if we exclude their claims because

1   they don't apply to Propylene, they don't apply to whatever the

2   predecessor product was that was -- at that point the supplier

3   for the product was -- or the -- with Shimizu.  I'm concerned

4   that we run into an issue where we may be in front of Your

5   Honor again when we try and support our defense of laches

6   saying we changed to this product.

7            MR. FITZGERALD:  This product isn't in dispute.

8            THE COURT:  When did Lipozene come into play?

9            MR. FLAHERTY:  I'd have to check.  I believe '06 is

10  correct, but I'd have to check.

11           THE COURT:  So if what you're suggesting then is that

12  I should not limit the request to Lipozene and I should allow

13  it to be expanded to all of your glucomannan products because

14  you think that will help you in terms of your laches defense,

15  I'm happy to do that.  You're -- it's --

16           MR. FLAHERTY:  It's a difficult question admittedly.

17           THE COURT:  It's a question that you need to answer.

18  I mean, as I say, if I'm in a position here where weirdly it

19  seems that the discovery requests are those that can help you,

20  and yet you want me to limit them on the one hand and now

21  you're suggesting that maybe we shouldn't limit them and we

22  should open them up.  I'll do what you like because in the end,

23  this is discovery you have to -- that you have to produce

24  anyway or they -- or you'd be seeking from them any information

25  they have about, you know, their internal knowledge of the

1   relative merits of your glucomannan products right.

2           MR. FLAHERTY:  Well, I don't think we had a fair

3   opportunity.  They just incorporated --

4           THE COURT:  Well, no, I'm looking at Shimizu.  I

5   appreciate the notion that there's a dispute regarding Fiber's

6   ability or -- to stand in the shoes of Shimizu.  I know there's

7   an agreement at the heart of that and whatever it is, it is.

8   I'm not going to be the one to decide it.  I have been looking

9   at Fiber simply as being the password for Shimizu.  What we're

10  really talking about is Shimizu.  I know that you asked to have

11  Shimizu added as a party which eliminates that whole issue.

12  Again, I'm not sure how that inures to your ultimate advantage,

13  but it's something you decided to do, but I'm looking at this

14  as I believe that it's fair the way I understand what I

15  understand about this relationship is that Shimizu's knowledge

16  is going to be imputed to Fiber.  I don't think Fiber's going

17  to fight about that.  Well, they might some day.  I don't see

18  it considering the position that they're taking.  They can't

19  also have a two-edged sword.  If they're going to be

20  representing Shimizu's lost sales as their own, then they're

21  also stuck with Shimizu's knowledge, so this is discovery you

22  would get, so why fight it now I guess is -- it gets back to

23  that same question.  Do you want me to say yeah, they can have

24  it regarding any of your glucomannan based products?

25           MR. FLAHERTY:  No, absolutely not because I don't

1  think the --

2           THE COURT:  Then what are you saying?

3           MR. FLAHERTY:  I think that we come to this case from

4  different circumstances, and ours is one in which we had this

5  relationship with Shimizu, not Fiber, ten years ago and even

6  predating, and theirs is one where they came in 2014 or 2015.

7           THE COURT:  But your laches defense is predicated on

8  the notion that Fiber was standing in the shoes of Shimizu.

9  Fiber certainly couldn't have been subject to laches because

10 they didn't exist until recently.  So to the extent you're

11 pursuing the laches defense at all, it is based on the notion

12 that Fiber is stuck with Shimizu's knowledge, right?

13          MR. FLAHERTY:  Correct, but the idea of the notion

14 that we'll be able to get that information through Fiber I

15 think is farfetched.

16          THE COURT:  Well, I don't know.  I mean that's -- we

17 talked about you weren't in the original discovery meetings

18 that we had, but there was an assurance that Shimizu will be

19 cooperating in this litigation regardless.  Whether that's born

20 out or not, I don't know.

21          And on the other hand, Shimizu may be a party.  So

22 we'll deal with that.  But it doesn't change the analysis as to

23 if you believe that you're -- assuming for the moment that

24 Shimizu's knowledge is, in fact, imputed to Fiber across the

25 board so that your laches defense has legs against Fiber, which

1   I would assume you'd want, you're suggesting, it sounds like,

2   that laches defense might be based in part not just on the

3   Lipozene product, but that on predecessor products because they

4   were substantially the same.

5        MR. FLAHERTY:  And that's the fact that I'm not quite

6   sure about.

7        THE COURT:  Well, then that changes the mix.  I'll

8   just say for now I'm going to limit it for Lipozene.  You have

9   the decision to make, and that's -- perhaps that's something

10  that you can meet and confer about.  If your laches claim is

11  going to be based on prior formulations that they're so similar

12  to Lipozene at what they knew about Propylene carries over to

13  Lipozene, then this discovery is fair game, but if you're

14  saying -- I think today you're saying no, I'll deal with that.

15       MR. FLAHERTY:  Correct because I think that's what's

16  in dispute by virtue of the amended counterclaims.  I don't

17  think that they have the right to conduct discovery on anything

18  beyond lipozene, but that -- I don't think that should close

19  the door.

20       THE COURT:  They have the right to discovery regarding

21  any defenses.

22       MR. FLAHERTY:  Correct.  And it's my hope and my

23  intention that that would only affect Lipozene.  I would just

24  need to make sure.

25       THE COURT:  Okay.

1           MR. FITZGERALD:  If I may maybe crystallize a bit, the

2    reason Propylene is relevant, we think, is because there was

3    this study done in 2004 by this guy named Katz, and at the

4    time, 2004, that's two years before Lipozene, it was Propol,

5    and the study was done on Propylene, and at the time they were

6    buying -- it's called Propylene because they were buying Propol

7    from Shimizu, and I've got documents I can show you.

8           THE COURT:  I don't want to see documents.

9           MR. FITZGERALD:  Okay.  But what I'm saying is it's

10   not just speculation.  We know for a fact that the 2004 Katz

11   study was done on Propylene using Shimizu Propol.  Two years

12   later they changed the name to Lipozene, but we don't really

13   know when they started violating.  You know, they were still

14   buying some from Shimizu and mixing it with others, and we

15   don't know who the other suppliers are, and we don't really

16   know the time.  We know there was probably a study.  We know in

17   late 2006, early 2007 they started marketing it as Lipozene,

18   but we don't really know exactly the chronology in that 2004 to

19   2007 time period.  And so I think at least Propylene is

20   relevant because that's why they were buying it from Shimizu

21   for that product.  They used that study, citing that study in

22   all their advertisements since 2006 even though it's Propylene.

23   So it's what they're relying on.

24          THE COURT:  Well, yes and no.  I mean the case put

25   aside the laches defense for the moment.  The case is about

1    from the plaintiff's side declaratory judgment that the

2    Lipozene product -- that the manner in which the plaintiffs are

3    marketing their Lipozene product is not unfair, is not

4    deceptive, it doesn't impact Fiber, right?

5                MR. FITZGERALD:  Right.

6                THE COURT:  So the case apart from laches is about

7    Lipozene, the Lipozene product.  What is its?  What are its

8    ingredients?  How is it manufactured?  How does it compare

9    scientifically, if that's to be the basis of the case --

10               MR. FITZGERALD:  Right.

11               THE COURT:  -- with Shimizu's product.

12               MR. FITZGERALD:  That's fair.

13               THE COURT:  When we start talking about the Propylene

14   predecessor, that only goes to the issue of laches, and right

15   now I'm going to take Obesity at their word that it has nothing

16   to do with laches, and if they change their mind about that,

17   then this information has to be disclosed.  Okay.

18               MR. FITZGERALD:  I hear you, Your Honor.

19               THE COURT:  And I shouldn't have another dispute about

20   that.  It seems to me that it really is on the Obesity side to

21   say okay.  Our laches defense isn't just that they knew

22   about -- that what Lipozene is, that Lipozene is essentially

23   the same as Propylene, and they knew back then what we were

24   saying about it and didn't care, right?  So if that's going to

25   be the argument you make ultimately, Propylene is an

1  open -- you know, is opened up.  If you want to open it up

2  today, I can do that, but I -- it looks like you're -- you

3  don't want me to go that far.

4        MR. FLAHERTY:  I don't want you to go that far,

5  absolutely.  I guess the question is is if we can chemically

6  show that there is no difference, then what occurred back then

7  is totally irrelevant.

8        THE COURT:  But have you shown that without exposing

9  what was in Propylene.

10        MR. FLAHERTY:  We simply need a sample from Shimizu.

11        THE COURT:  I thought Propylene was your product?

12        MR. FLAHERTY:  I'm speaking of Lipozene and Shimizu.

13  If we had that today, then none of this matters because --

14        THE COURT:  Well, none of this matters is true except

15  you've asserted a laches defense, which does -- I mean

16  all -- of if all we need to do is say this is Shimizu's Propol,

17  this is our Lipozene, let's have our experts look at both and

18  say whether they are substantially the same, if that's the

19  whole case, why are we here fighting?

20        MR. FITZGERALD:  Your Honor, if --

21        THE COURT:  I guess that's -- I mean that's -- I'm

22  trying to figure out this because I'm required to and now we're

23  required to under Rule 1 to move this thing forward in a just,

24  efficient way.  If this case can be decided simply based on a

25  scientific analysis, whether you agree on experts or have your

1   own experts to say Propol versus Lipozene, is it the same or is

2   it not, if that's the case, then why are we messing around with

3   this?  Make that the case.  I'll put all this off while you

4   decide that issue.

5           MR. FLAHERTY:  The second component to that of

6   determining that is when Shimizu knew it no longer supplied us,

7   so it has been the same since, as you noted, 2006, then what

8   happened with Propylene or any other product again is

9   irrelevant.  If it's different --

10          THE COURT:  Well, if it's the same -- it's the same,

11  then the whole laches defense is irrelevant because the claims

12  all fail.

13          MR. FLAHERTY:  Correct.

14          THE COURT:  Everything fails.  The only way we -- in

15  that world that we go forward with laches is that if it is a

16  different product.

17          MR. FLAHERTY:  Correct.

18          THE COURT:  That Shimizu was aware of those

19  differences and what you were saying allegedly that it's the

20  same even though it's different, that does, you know -- that's

21  why we're here.  This is where this discovery goes.  And it's

22  up to you, you know, how you want to spend your client's money.

23  If this is an easy question, here's the product, here's the

24  product, they work or they don't, tell me that, and we'll put

25  off spending all this time and money until you resolve that

1  question.  And if that question is resolved, that it is

2  different, then, of course, it will open up again to when did

3  they know that it was different and that we were saying that

4  they were the same.  I'm trying to find a way to get out of

5  this --

6      MR. FLAHERTY:  It sounds like you're suggesting

7  bifurcation where we technically --

8      THE COURT:  No, not bifurcation.  Not bifurcation.

9  It's just that if there is, I can stay all these various levels

10  of discovery if I think it is the right thing to do if there is

11  a threshold issue that can determine whether all of this

12  discovery is even necessary, right?  So if the question is is

13  our product the same over X period of time to Propol, it's, you

14  know, game over, if that's -- if the experts agree.  If they

15  don't agree, then, of course, these other -- these sideshows

16  come into play.

17      MR. FITZGERALD:  I may be able to head it off, Your

18  Honor, because we served on October 16th an expert report from

19  Dr. Thomas Wolever, who is probably the world's leading expert

20  on dietary fibers, started research on it in the '70s.  He's

21  looked at testing, and his opinion is they're not the same and

22  the Lipozene is far inferior.  We have an expert report.

23      THE COURT:  All right.  So it looks like the experts

24  probably are not going to agree.

25      MR. FLAHERTY:  When you break it down, it's not going

1   to be the exact same substance that's in a pill with the gel

2   capsule.

3          THE COURT:  Yes, and that's for the trier of fact

4   ultimately to figure out, so essentially so take this notion of

5   whether all this is necessary, it looks like it is.

6          MR. FLAHERTY:  We'll meet and confer.

7          THE COURT:  Meet and confer, and you need to decide

8   whether or not it is to your advantage or not to open up the

9   door appropriately.

10          MR. FLAHERTY:  Agreed.

11          THE COURT:  And it may be so.  But I'm not going to

12   order it today because -- all right.  Where were we?

13          MR. FLAHERTY:  Number 6.

14          THE COURT:  6, contracts regarding the product, I view

15   that as overbroad, burdensome, and not relevant as to -- since

16   I'm giving you the ingredients, the specs, the formulations,

17   who they might have sold to, I don't think that's Title C that

18   is relevant.

19          MR. FITZGERALD:  If I may briefly be heard on one

20   thing, first of all, I just want to point out that most of this

21   stuff that is done is purchase orders, contracts are done on a

22   purchase order basis, so it's really purchase orders.  And

23   those meet specifications.

24          THE COURT:  You're getting those.

25          MR. FITZGERALD:  But what we're not getting is sharing

1  costs, and under 1117 one of the measures of damages is defined

2  as profits, and then they have to revert to cost to deduct

3  against them, so it's relevant discovery on damages.

4          THE COURT:  And I think that discovery of the

5  contracts themselves is well beyond what you're suggesting, so

6  I'm not going to order it.

7          Second is advertisements.  Yeah, that seems to be well

8  within what the case is about, again, going back to '06.

9          MR. FLAHERTY:  Could I speak to that?

10          THE COURT:  Sure.

11          MR. FLAHERTY:  Every advertisement that Lipozene has

12  ever run would be -- it's -- this would --

13          THE COURT:  Well, I mean it's -- it really -- to the

14  extent you have an advertisement that ran 4,000 times, you only

15  disclosed one.  You don't disclose all 4,000, right?  It's one

16  ad.

17          MR. FLAHERTY:  Correct.

18          THE COURT:  This is the ads themselves, not where they

19  ran.

20          MR. FLAHERTY:  Correct, the design -- there's a big

21  component to marketing, which is the change you're advertising,

22  as I understand it, keep it fresh, and so it's not as if -- at

23  least to my knowledge today, it's not as if from 2006 to 2015

24  or even then the long period of time.  So in that respect I

25  would ask that plaintiff or counter-claimant identify that.  Is

1  it just those that show the reference to the clinical study?

2  As I understand it, that's the only hook in the counterclaims.

3  Is it every advertisement for Lipozene or is it just the --

4          THE COURT:  That's actually an interesting suggestion

5  because to me that does have some merit.

6          MR. FITZGERALD:  Well, number one, that wouldn't

7  alleviate the burden because they would still have to review

8  all the advertisements.  They should put the burden on us.

9          THE COURT:  That's true.

10          MR. FITZGERALD:  But I think it's about more than any

11  one particular advertisement.  We don't know what they're

12  saying, but we know that the -- that -- at least we allege that

13  the things we do know, that they were saying so far that we do

14  know, aren't supported by the studies, so what else were they

15  saying?  I think that's perfectly reasonable and appropriate.

16          THE COURT:  Here's the bone I'll give you.  I think

17  it's relevant, but I agree that it's possible that this could

18  be a burdensome and expensive exercise.  I will give you leave

19  to bring this particular issue back before me with support for

20  a claim that it is unduly burdensome, expensive, and the like,

21  and if the defendants still want it, I may have them pay for

22  it.

23          MR. FITZGERALD:  That was going to be my next thing.

24  The specific burden is they haven't made a specific showing.

25          THE COURT:  So I'm not -- I'm finding it relevant

 1   today, so to me it is disclosable.  You've suggested that it

 2   can be burdensome.  I'm going to allow you the opportunity to

 3   explore that.  You can bring that back to me.  And, as I say,

 4   if I still consider it -- if I consider its relevance, what do

 5   you suggest -- only regarding clinical studies, then that's

 6   something we do.  If it's otherwise burdensome and the

 7   defendants really want it, as I say, the rules allow for me to

 8   split costs, and I may do so.  Again, something to talk about.

 9   I really encourage you to communicate, and you don't have to

10   fight about everything.

11          MR. FITZGERALD:  To make another point, since 2006

12   we're aware of 14 commercials in ten years, TV commercials, so

13   that's not a lot.

14          THE COURT:  I don't know.  All I'm finding is that it

15   appears to be relevant.  There's a suggestion that this may be

16   a bigger issue than it appears.  They can certainly -- they

17   should raise it with you, and if it remains in dispute, come

18   back, and I can decide its relevance versus that.

19          MR. FITZGERALD:  Could we have a date certain by which

20   they have to make a showing because otherwise if they just

21   say -- the declaration down the road, don't worry about it.

22          THE COURT:  At the end when this order finishes, I

23   will be ordering that the items that I have ordered disclosed

24   be disclosed by a date certain.  That triggers this process of

25   a new discovery dispute.

1          Okay.  That gets us to 8, ingredient list,

2   formulations.  Again, I'm going to limit it to Lipozene

3   recognizing that you may agree to open it to Propylene at some

4   point and, again, back to '06.

5          Same with 9, product specs.  Again, I'm limiting it to

6   Lipozene back to '06, but you can expand that if you consider

7   it to be a mutual interest.

8          I see no relevance to 10 to the '05 FTC order.  You

9   have to give me something on that.

10          MR. FITZGERALD:  The FTC brought a case based on

11   ORI -- its allegations that ORI was making false or misleading

12   claims about Lipozene, very similar to the merits in this case,

13   and ORI agreed and the FTC sought ORI's maintenance of these

14   records because these are the items that the FTC thinks that we

15   want to determine that are continuing to mislead.  We

16   need -- these are the things that get us quickly to be able to

17   make the determination.  These are the most important records

18   that they can keep, maintain, and provide us in the future if

19   we want to check up on it, so it seems like --

20          THE COURT:  When you say "us," I mean --

21          MR. FITZGERALD:  The FTC, so the FTC is saying, you

22   know, these A through K, these records if we need to

23   review -- because they have consent where they have continuing

24   obligations to refrain from making misrepresentations and so

25   forth, and the FTC has continuing --

1            THE COURT:  The FTC does.  You don't.

2            MR. FITZGERALD:  That's right, but the -- but I'm

3    arguing about the relevance of the documents because if the FTC

4    says they're relevant as to whether ORI is misleading, I think

5    that's a good indication that they're relevant in this case as

6    well.  That's the argument.

7            THE COURT:  No, I'm going to deny that.

8            12 is all documents supporting the defenses, again,

9    that's duplicative of Rule 26(a), so I'm going to not enforce

10   that.

11           And then customer complaints, I don't view that as

12   relevant.

13           MR. FITZGERALD:  The relevance is mostly the

14   efficacy -- one of the things we allege is a loss of goodwill

15   because we think our stuff is really good and their stuff is

16   really bad, and yet they're selling it as our stuff, so if a

17   consumer complains and says, you know, your stuff is terrible,

18   I took it for a month and didn't lose any weight, that would

19   help establish our losses.

20           THE COURT:  No, I think it's too attenuated.  So I'm

21   going to not enforce 13 either.

22           Okay.  I think that I have covered the matters in

23   dispute.  I think -- I'm trying to decide whether 14 days is

24   enough time, but I'm -- I don't want to give anybody a heart

25   attack.

1          MR. FITZGERALD:  I just want to also say we've only so
2    far received 300 pages from Obesity Research, and there were
3    certain things like specs and formulations that they didn't
4    object to during the past three years, they'd only objected
5    over the long period, but based on the objection, I think a lot
6    of these we haven't gotten anything.  So, you know, I guess I
7    just want to make sure that -- we don't really know what
8    they're withholding, and the production should be completed now
9    I think that this is resolved.

10          THE COURT:  To me it's just a matter of I want to make
11   sure that there's enough time built in to collect data if it
12   hasn't already been collected, discussing whatever outstanding
13   issues there may be and have a production date.

14          MR. FLAHERTY:  Of course we'd like more time, and I
15   think that plays --

16          THE COURT:  We'll deal with that next.

17          MR. FLAHERTY:  All right.

18          THE COURT:  I'll deal with the motion to continue
19   next.  To me it's just a matter of how much time is necessary
20   at this point to produce what I've ordered to produce as well
21   as potentially be in a position to tell me that some other
22   production is so burdensome and its relevance so limited that
23   there should be some form of relief whether it's cost shifting
24   or change in the nature of the production.  If -- I mean I can
25   go out as far as 30 days, but that's like -- that's the max,

1   and --

2              MR. FLAHERTY:   30 days --

3              THE COURT:   -- I won't go beyond that just to be

4   clear.   That's it.   30 days is it.

5              MR. FLAHERTY:   -- to produce production or the issues

6   of production or opposing counsel --

7              THE COURT:   Well, here's the thing.   What

8   I -- I'll -- I don't want to see on day 30 a motion that you

9   haven't produced anything; that you met and confer on day 28

10  and couldn't reach agreement.   I'm really -- I'm just -- I

11  don't want to play that game.   The purpose of the 30 days is to

12  produce these records, and if there is some subset of them that

13  is problematic, you have got to get that back before me

14  promptly.

15             MR. FITZGERALD:   And, Your Honor, is my understanding

16  correct that the only topic on which they're allowed to -- is

17  the advertisement?

18             THE COURT:   The advertisement, and the other issue

19  which I've left for you to decide for now is the issue of

20  Propylene.   The plaintiff's arguments are -- I don't mean

21  disrespect, but it's -- you need to decide whether Propylene is

22  relevant to your laches defense or not.

23             MR. FLAHERTY:   With regard to documents that you're

24  going to compel, I would ask that the Court revisit the issue

25  of sales.   We have serious concerns, and I don't think it's

1  with regard to local counsel.

2          THE COURT:  It's a gross number.

3          MR. FLAHERTY:  I understand, but it's a number that we

4  think is going to be used as a strategic mode to decide whether

5  or not they dig in their heels and continue this or whether or

6  not this is essentially a target big enough worth shooting.

7          THE COURT:  It's the same -- that issue is apparent in

8  every case, every business case that we have.  It doesn't make

9  it not relevant.  I appreciate that, you know, we have a

10 protective order in place, but I appreciate the notion that

11 that issue can have other tactical or strategic components.

12 Nothing we can do about that.

13         MR. FLAHERTY:  But there would be no burden to Fiber

14 if we were to essentially delay that until the motions to

15 dismiss, pending motions, are decided.  If we give them the

16 relevant information regarding liability in the meantime and we

17 put off again this issue for another day, there will be no

18 injury or --

19         THE COURT:  What you're talking about is simply

20 delaying the gross figures of your annual sales going back

21 three years.

22         MR. FLAHERTY:  Well, it's my understanding that's the

23 only items that the Court is going to cover.

24         THE COURT:  Yes.  Gross sales issued for the last

25 three years, I think that's relevant.

1        MR. FLAHERTY:  I'm not going to -- I appreciate that

2   it can be factored into other decisions, but you know what?  To

3   the extent financial condition is relevant to establish

4   whether --

5        THE COURT:  Yes.

6        MR. FLAHERTY:  -- gross sales issued for the last

7   three years --

8        THE COURT:  I think that's relevant.  I'm not going

9   to -- I appreciate that it can be -- may factor into other

10  decisions, but you know what?  To the extent that financial

11  condition is relevant to decide whether this battle is worth

12  fighting from both sides, that's a fair consideration.

13       All right.  So I'm going to give you 30 days to

14  produce or get the matter back before me in the limited areas

15  that I've allowed for.

16       That gets to the question of the extent to which I

17  should continue the case management schedule.

18       I will say that the most compelling reason to delay

19  the schedule is the arrival with new counsel.  It was three

20  months of the open discovery period before new counsel came

21  into play.  Of course, it's always, you know, the client's

22  decision to change counsel and deal with that issue, but I also

23  in the interest of fairness want to make sure that plaintiff's

24  counsel aren't constantly behind the 8 ball.

25       And I'm not suggesting they have been or are, but I do

1  think that some relief under the scheduling order is

2  appropriate, not because of the pending motions.  I don't think

3  that they change much.  I would say that I'd be interested in

4  each of your perspective as to whether or not the motions to

5  dismiss will be granted, but to me the only factor that may

6  change things is if Shimizu comes into the case, but then I'm

7  not sure to the extent to which that changes it if, as has been

8  suggested all along, Fiber is really a front for Shimizu anyway

9  and it's the same stuff.

10        But in any event, I am inclined to grant some relief,

11 and the question is how much to give, and I'm happy -- it's

12 certainly not going to be -- we're not going to wait for the

13 district court to render a decision.  I'm going to give you 30,

14 60, 90 days at max, and all of that depends upon -- to the

15 extent that it impacts district court dates, I need to get

16 permission from the district court to adjust that.  Permission

17 is probably -- will be forthcoming when I ask for it, but I

18 just need to get a sense as to what is rational here.  I don't

19 want the discovery period to go on forever.

20        And, you know -- and, again, my -- my fear is always

21 that when I either have the initial period or grant an

22 extension that people sit back with a sigh of relief and say

23 oh, good, I can go do all the work for two months.  And I

24 intend to the extent I grant you a continuance -- and I am

25 going to grant something -- I intend to do some serious due

1    diligence during this time, and the likelihood -- I will tell

2    you that I will not extend the date again if it's based upon

3    the pendency of discovery disputes.  I'm going to hold that

4    against both of you.  If something extraordinary comes up, and

5    sometimes they do, that's a different question.  And I have

6    been known to extend discovery deadlines for limited purposes.

7    If, for example, I think we discussed early on -- you weren't

8    there -- whether a deposition in Japan was necessary, the time

9    I think it was clear that Shimizu would not rely upon the

10   international boundary requiring you to go there, embassy time

11   and all that stuff, that can really be a matter of delay, but

12   if something like that happens, I can deal with it.

13          So with that, you know, in mind, what is a rational

14   time period that we can get these things done barring

15   unforeseen complications?

16          MR. FITZGERALD:  Your Honor, if I may be heard

17   briefly, just on what I mentioned, the primary reason being the

18   substitution of counsel, I just do want to give a little

19   background context.

20          Even before new counsel substituted in, they were

21   involved in the meet and confer call that we had on

22   September 18th, so it was both -- all counsel, new counsel and

23   us, on the phone.

24          THE COURT:  And I get that, and that seemed pretty

25   clear to me.  The notice or I guess the motion was

1  September 18.  It was granted on the 22nd or something like

2  that.  I always expect there to be a little transition, but it

3  doesn't change it dramatically.

4          MR. FITZGERALD:  And discovery being pursued up to

5  that time.  That was shortly before the expert disclosures were

6  due, and we got our expert disclosure in, and at the time they

7  made their expert disclosure.  I don't think that date should

8  be moved retroactively.  The disclosures and the -- in terms of

9  extending the date, we want the shortest possible.  We feel

10 like we're pretty ready to move forward.

11          I do want to clarify at the ENE we don't have control

12 over Shimizu or even though we're licensees, we can't force it

13 to do anything.  What we said is we will make our best efforts

14 to see if we can facilitate Shimizu's cooperation, but at the

15 end of the day, we can't force it.

16          THE COURT:  I do remember that, but I also remember

17 the next thing which we don't anticipate it being a problem.

18          MR. FITZGERALD:  Okay.

19          THE COURT:  And --

20          MR. FITZGERALD:  And that's --

21          THE COURT:  I don't hold you to that.

22          MR. FITZGERALD:  And I still -- that's still our

23 position.

24          The second thing is that the Hague Convention via

25 Japan is really easy.  They've been elected to do the exception

1   or something, so you don't actually have to go through
2   everything.  They argue in their papers actually in the motion
3   to add Shimizu that it's really only a few weeks.  I believe
4   you can just be accomplished in Japan by mailing.

5            So that being said, they haven't served Shimizu with a
6   subpoena yet except there was a Shimizu in Las Vegas a week or
7   two ago, and they went and served him with a subpoena.  Now,
8   whether that subpoena is valid and so forth, we're not
9   conceding that, but they've made an effort to serve Shimizu
10  here in the states.  They made no effort to serve Shimizu in
11  Japan.  I don't know why.  We've got a deadline of December
12  18th, and they've known this since last April or May.  I don't
13  know why they didn't bring the case against Shimizu to start
14  with if they now believe that Shimizu --

15           THE COURT:  In the end we had new counsel as of
16  September, so -- and I do want you to grant some relief and
17  recognizing that some of the decisions that were made before
18  could be revisited.

19           MR. FITZGERALD:  I would just say 30 days is good.  We
20  would argue for a minimal --

21           THE COURT:  And I get that because you were in
22  opposition to begin with to your motion.

23           MR. FLAHERTY:  The reason I think 90 days makes sense
24  is because you're going to give us 30 days to produce.  The
25  documents are still at issue.  The exchange hasn't occurred.

1    We were -- it was represented to both us and the Court that all

2    production has been made from Fiber.  That didn't occur until

3    Friday.

4            I might note that the purported assignment was

5    a -- and I don't know if there's any other attorneys in the

6    room.  The point being we didn't have the opportunity to look

7    at this document and test this document until Friday.  There

8    were all kinds of documents that were withheld and weren't

9    given us to until that day, which was after the expert

10   exchange.

11           Their expert -- maybe they want to rely on the court

12   as is, but it relies on zero independent analyses of their own

13   expert.  Our expert opined if he had no documents to be able to

14   make an opinion as to their damages, so the 90 days makes sense

15   because we're going to be exchanging documents for another 30

16   days.  We need an opportunity to give those to the expert and

17   then for them to provide an updated report.

18           MR. FITZGERALD:  Your Honor, that's not --

19           THE COURT:  I'm not granting the continuance because

20   we didn't get everything we were supposed to get.  That sort of

21   argument sort of falls on mostly deaf ears.

22           To me the two reasons for me to continue the deadlines

23   to some extent, one is the entry of new counsel, and I think

24   it's fair; and second is that the dispute regarding how far

25   back in time that aspect of the discovery dispute while I did

1    find the way it came up weird, I think it's legit, and that is

2    going to require the production, I assume, of more documents.

3    It's a lot or little, I don't know, but the question is how far

4    out to go beyond that.

5              MR. FITZGERALD:  How about 45 days?

6              THE COURT:  No, I'm actually -- to be honest, I'm

7    thinking about 60, and the reason I'm thinking about 60 is for

8    two reasons.  One is that there may be as a consequence of

9    whatever this latest exchange of documents takes is going to be

10   some apparent need for additional fact discovery that may not

11   have been apparent before, and I agree with the notion that it

12   may require some updating by the experts, and you're not going

13   to want to depose the experts until they were in a position

14   where you and they believe they have what they're going to get.

15             MR. FITZGERALD:  Your Honor, is that to say that the

16   expert disclosures that have already been made, those reports

17   can be updated, but not new expert disclosures?

18             THE COURT:  Correct.  I don't see any need for new

19   experts.  It's not new.  Although I would say that to the

20   extent that it would have -- it should have happened already.

21   Was there a damage expert disclosure?

22             MR. FLAHERTY:  We designated him.

23             THE COURT:  Okay.  And then the other side hasn't

24   received any damages information.  Is that fair?

25             MR. FITZGERALD:  And we don't have a damages expert.

1          THE COURT:  You're not going to have one?

2          MR. FITZGERALD:  I'm not going to have one.

3          THE COURT:  Okay.  That's fine.  So I'm looking at 60

4    days as fair --

5          MR. FLAHERTY:  If Your Honor would indulge me in that

6    being able to redesignate a liability expert is necessary in

7    our case because we didn't have access to the facts at the time

8    that the designation took place.  There's essentially no

9    expert.

10          THE COURT:  Well, it would still be the same.  It

11   would still be the same expert.  The way it looks to me is that

12   you're not getting any new -- this is -- these are disclosures

13   I've ordered you to provide to the defendants, so how does that

14   change things for you?

15          MR. FLAHERTY:  Well, because the documents didn't get

16   here till Friday.  There's a great deal of Fiber Research --

17          THE COURT:  But your expert can certainly -- has the

18   option to do a rebuttal report based upon new information.

19          MR. FLAHERTY:  Correct.

20          THE COURT:  It's not a new designation.

21          MR. FLAHERTY:  Correct.

22          THE COURT:  It's either a supplemental or rebuttal

23   report.

24          MR. FLAHERTY:  Aside from nonretained experts, we

25   didn't have an opportunity to designate a retained expert at

1   the time of disclosure because effectively there's very few

2   people in the world that can reliably opine -- provide a report

3   based upon the information that we have about this case at the

4   time.

5            THE COURT:  That's a different dispute.  I'm not going

6   to rule on that.  As it is, what I'm going to do is expand

7   the -- I'll have to get permission from Judge Bashant, but

8   assuming I get it, you can expect the schedule to be extended

9   by about 60 days, whatever -- if she does, she does.  The -- I

10  will not order -- I will not provide for new expert disclosure

11  dates; however, if you -- if there is a legitimate issue about

12  that and you can't agree, that's a dispute I'll hear.

13           MR. FLAHERTY:  On papers?

14           THE COURT:  Yes.  Either papers or, if I can, I'll

15  bring you in to talk to you, but the notion would be that for

16  whatever reason the -- you need a new expert, I mean

17  that's -- you could try.

18           MR. FLAHERTY:  Thank you.

19           THE COURT:  All right.  I think that's covered.

20  Jennifer, how have I done?  Got it covered?

21           MR. FLAHERTY:  There remains, I suppose, one issue.

22  Whether it's a housekeeping issue or substantive issue, I don't

23  know.  I don't know if it remains pending for your disposition

24  or whether it was an oversight, but our request for the

25  production of documents, our request to compel their documents,

1  it is my understanding that your order only requested -- or

2  only authorized or compelled the production of that one

3  interrogatory.

4          THE COURT:   The rest of the matters in dispute as I

5  read them unless I missed it, which is possible, all had to do

6  with the fact that you were going to make disclosures once the

7  protective order was in place.  The protective order is now in

8  place, so in theory anything that you were withholding, and I

9  thought it was the bulk, all but interrogatory 3 were

10  based -- and if I missed that, I'll go back and look at it

11  again, but it was my impression that interrogatory 3 was the

12  only thing that was independent of a protective order being in

13  place, and once the protective order is in place, there's

14  nothing -- there was no real dispute beyond that.

15          MR. FLAHERTY:   We would ask provided or assuming that

16  Friday's production by Fiber is, in fact, everything and they

17  no longer stand on any of their objections, everything has been

18  properly designated under the protective order, we would ask

19  that they amend their responses and verify such.

20          THE COURT:   This whole verification of responses isn't

21  federal law.   That's a state court practice.  We don't do it.

22  The fact that a discovery response is sent by the lawyer is

23  verification under the rule.  There's no amended verification.

24  Don't confuse state procedure with federal.

25          MR. FLAHERTY:   Apologize.

1           THE COURT:  That's all right.  So, again, I don't know

2   the quality of their production.  If there's a dispute about

3   the quality of the production -- the rules are the rules -- you

4   meet and confer, figure out what the problem is, resolve it.

5   Or force me to.

6           MR. FITZGERALD:  And I will just say for clarification

7   of the record and to be clear that our document production is

8   complete.  We completed it the same day that the protective

9   order was entered.  As far as we're concerned, our production

10  is complete.  ORI's isn't, but we look forward to receiving it.

11          THE COURT:  That was my impression, that that dispute

12  was simply almost a place keeper with the exception of

13  interrogatory number 3.

14          MR. FITZGERALD:  Thank you.

15          THE COURT:  Anything else then?

16          MR. FLAHERTY:  No, Your Honor.  That's it.

17          THE COURT:  I hope not to see you again except at our

18  mandatory settlement conference unless you settle before that,

19  but if I do, I do.

20          MR. FLAHERTY:  All dates are being carried over,

21  correct?

22          THE COURT:  You'll be getting a new scheduling order.

23  I'm trying to get 60 days.  I'm not sure how that's going to --

24  ultimately what -- the discovery date will change for sure.

25  How much slippage you'll see in the district court side remains

1  to be seen, so I suspect the deadline by which you'll have to

2  bring dispositive motions will change.  I suspect as a

3  consequence of that, your pretrial conference date will change.

4  Your anticipated trial date may not change.  It just depends

5  upon what the district judge wants to do, and she will let me

6  know, and I'll do the scheduling order.

7       All right.  Anything else?  We'll probably move that

8  right now.  That's an open question.  I do have a mandatory

9  settlement conference set for January.  I do that because I try

10  and do it just after the close of discovery before the big

11  pretrial work occurs.

12       As discovery deadline is going to change, the question

13  to you is whether you still want that date, whether you want me

14  to vacate it and not have one at all because there's no way

15  you're going down that path or whether you want me to set a new

16  mandatory settlement conference date after the close of the new

17  discovery period.  Any thoughts?

18       MR. FITZGERALD:  It probably makes sense to set it

19  after -- or to set one after the close of the new discovery

20  period.

21       THE COURT:  All right.  So we'll do that.  I'll vacate

22  the January 1 and set it for whatever -- just after the close

23  of the new discovery date.

24       MR. FITZGERALD:  Thank you.

25       MR. FLAHERTY:  Thank you.

1          THE COURT:  Thank you all.

2          THE CLERK:  That concludes all matters on this Court's

3   calendar.  We are off the record.

4                          ---oOo---

5                  C-E-R-T-I-F-I-C-A-T-I-O-N

6

7          I hereby certify that the foregoing is a correct

8   transcript from the electronic sound recording of the

9   proceedings in the above-entitled matter.

10          Dated November 4, 2015, at San Diego, California.

11

12
                        /s/ Dana Peabody
13                     _____

14                        Dana Peabody,
                        Transcriber

15

16

17

18

19

20

21

22

23

24

25